5L 232
d116 184
116 193

JAMES E. COFFMAN *v.* LOOKOUT BANK.

FRAUD. *Undue advantage.* A note executed to a bank by a father, to take up two notes of his son on which the names of the father and other persons were forged as endorsers, will be cancelled in equity when it appears that the information of the forgery was suddenly sprung upon the father at a private interview between him and the officers of the bank, one of whom was a lawyer, brought about by the bank, no opportunity being given the father to consult with friends or obtain legal advice, and his state of mind being little short of mental aberration.

FROM HAMBLEN.

Appeal from the Chancery Court at Morristown. H. C. SMITH, Ch.

THEO. ROGAN for complainant.

J. C. HODGES for defendant.

COOPER, J., delivered the opinion of the court.

Bill to enjoin the prosecution of a suit at law upon a note, and to set aside the note on the ground of surprise. The chancellor dismissed the bill, and the complainant appealed.

The complainant is a farmer, with a wife and six children, two girls and four boys, five of them under age. He owns land worth about $1,300, and a few hundred dollars of personalty. He is a man who has lived a retired life, attending exclusively to the business of his farm, and never mingling with the world in a public capacity. His oldest son was about twenty-two years of age when the note in controversy was executed. He had developed a disposition to recklessness and improvidence. In June, 1876, this son applied to the defendant, the Lookout Bank of Morristown, to borrow money, and the bank discounted for him a note for $35 at sixty days, purporting to be endorsed by his father, his uncle and a third person. A few days afterwards the son again applied to the bank to discount a note for $900, with the same endorsers, dated June 21, 1876, at sixty days, which was done. On the next day the bank, at the instance of the young man, again discounted a similar note for $900, with the same endorsers, having the same time to run. The officers of the bank seem not to have been acquainted with the young man or

his antecedents, nor with the handwriting of any of the endorsers. Young Coffman had represented that he was, in connection with the endorsers, about to purchase wheat from certain persons, and it was the discovery incidentally, within a few days, by one of the officers of the bank that he had not bought any wheat from a certain party named, that the bank began to suspect the genuineness of the paper discounted. In reality, the names of the endorsers were forged. The principal officer and owner of the bank then saw the uncle of young Coffman, whose name had been used as an endorser on the notes, and who was a justice of the peace, and mentioned to him the discount of the small note, saying nothing about the larger notes. The uncle said to the bank officer that if his name was on the note it was a forgery, and asked to see the note. The bank declined to show it, and requested him to see his brother, the complainant, and ask him to call at the bank. He did see his brother, and having no doubt that the note was a forgery, and supposing that it was the only note discounted by the bank, advised his brother to pay it. Complainant borrowed the money, and went to the bank and proposed to take up the note. The cashier of the bank took complainant into a private room in the rear of the bank, telling him that if the small note was all it would be a matter of little consequence. He declined to make any explanation until he had gone after one of the directors of the bank, a principal stockholder and a lawyer. When the three were brought together in the closed room, the

two notes for $900 each were shown to complainant, and the business explained to him. As might naturally be expected, the complainant was literally overwhelmed by the calamity, "greatly moved and distressed," say the bank officers, and wept bitterly. The hour of the day at which the interview occurred, and the length of the interview, are left in some uncertainty. The owner and director of the bank, who was also a lawyer, and who gives the most connected narrative, says that this interview took place at two o'clock in the afternoon, and it probably lasted from one to two hours. The result of it was, that complainant paid and took up the small note, and gave to the bank his note, written by the cashier of the bank, of that date, July 5, 1876, at one day, for $1,742.50, with ten per cent. interest after maturity, payable quarterly. Before complainant left the room the cashier suggested to him that he wash his face to remove the traces of recent weeping, and it was agreed that the matter should be kept secret. One of the $900 notes was delivered up to complainant upon the execution of his note, and the other it was agreed should be surrendered when returned to the bank, it having been sent to Knoxville with a view to be used if the maker of it could be there found.

The complainant himself testifies that during this interview, owing to the suddenness of the communication and the nature of the calamity, he was incapacitated from entering into any contract with full knowledge of its scope. The other persons present admit the distress and agitation of the complainant, but say

he afterwards became calm, and proposed and entered into the contract with full possession of his faculties.

The proof of his brother and his neighbors is that he was thoroughly unnerved by the calamity, "almost in a state of mental aberration," to use the language of a neighbor and a physician, and "well nigh crazy," to use the words of other witnesses. In a few days he sent back the $900 note he had received and demanded his note. The other $900 note was sent to him by the bank on the 11th of July, and on the next day both of these notes were delivered to one of the officers of the bank, who received them, he says, to be used against the son, who had been arrested. Shortly afterwards the complainant was sued at law upon his note, and subsequently, on April 17, 1877, filed this bill. Owing to the absence of his lawyer, complainant seems not to have taken legal advice until eight days after the execution of his note.

The principal of equity jurisdiction on which this bill rests is thus stated by Judge Story: "Cases of surprise and sudden action without due deliberation may properly be referred to the same head of fraud or imposition. An undue advantage is taken of the party under circumstances which mislead, confuse or disturb the just result of his judgment, and thus expose him to be the victim of the artful, the importunate, or the cunning. It has been very justly remarked by an eminent writer, that it is not every surprise which will avoid a deed duly made. Nor is it fitting, for it would occasion great uncertainty, and it would be impossible to fix what is meant by sur-

prise; for a man may be said to be surprised in every action which is not done with so much discretion as it ought to be. The surprise here intended must be accompanied with fraud and circumvention, or at least by such circumstances as demonstrate that the party had no opportunity to use suitable deliberation, or that there was some influence or management to mislead him. If proper time is not allowed to the party and he acts improvidently, if he is importunately pressed, if those in whom he places confidence make use of strong persuasions, if he is not fully aware, of the consequences but is suddenly drawn in to act, if he is not permitted to consult disinterested friends or counsel before he is called upon to act, in circumstances of sudden emergency, or unexpected right or acquisition; in these and many like cases, if there has been great inequality in the bargain, courts of equity will assist the party upon the ground of fraud, imposition, or unconscionable advantage." 1 Sto. Eq. Jur., sec. 251.

When a court of equity relieves on the ground of surprise, it does so because something has been done which was unexpected, and operated to mislead or confuse the party on the sudden, and on that account has been deemed a fraud. *Earl of Bath and Montague's case,* 3 Ch. Cas., 56, 74, 114; *Evans* v. *Llewellyn,* 2 Bro. C. C., 150. The mere fact that a transaction has been improvident and precipitate, and entered into without independent professional advice, will not vitiate it, if the parties were on equal terms, in a situation to act for themselves, and fully understood

what was done. If the parties were not on equal terms, and one of them, from ignorance, agitation or undue importunity, is unable to protect himself, equity will protect him. Kerr on Fraud, 143; 1 Sto. Eq. Jur., sec. 222. The absence of professional advice is, in such cases, a material circumstance, especially if the other contracting party has such aid. *Kempson* v. *Ashbee*, L. R. 10 Ch. App., 19; *Baker* v. *Bradley*, 7 DeG. M. & G., 621. The English courts have said that a contract made with full legal advice on the one side and none on the other, will rarely stand the test of judicial scrutiny. *Clarkson* v. *Hanway*, 2 P. W., 205; *Murray* v. *Palmer*, 2 Sch. & Lef., 474. And see *Connelly* v. *Fisher*, 2 Tenn. Ch., 382.

Beyond all question the complainant was in no condition of mind in the brief interview between him and the bank officers on the occasion when the note in controversy was given, under the terrific domestic calamity suddenly sprung upon him, to act freely and intelligently. Without imputing any improper motives to the bank officers, it is obvious that the course taken by them led to that suprise which was unexpected, and operated to mislead and confuse the complainant, and must, in view of the condition of his mind and the absence of friends, be held to amount to legal fraud. A father, overwhelmed by the information that his eldest son had been guilty of forgery, upon the spur of the moment, and doubtless in the vain hope on his part of saving the family honor, executes a note for a larger sum of money than his entire property would bring at forced sale. His state

of mind afterwards, as shown by the weight of testimony, whatever the bank officers may have thought on the subject, was not such as to justify a ratification until he had taken legal advice. He refused, when again sent for by the bank officers to modify the contract by an extension of time and giving security, to entertain the proposition. The bank on this occasion seems to have been represented by two lawyers, who were also directors, while the complainant was without legal advice. He and the officers of the bank differ as to the details of the interview. But nothing that passed, and certainly nothing that was done, could affect the legal status of the parties, in view of the continued mental condition of the complainant and the absence of legal advice. There was nothing which amounted to a legal ratification of the previous act.

The chancellor's decree will be reversed, and a decree rendered in favor of complainant, and the defendant will pay the costs of this suit and of the suit at law.